**Chicago Directory Company, Appellee, v. Clark J. Herringshaw, Appellant.**

**Gen. No. 20,514.**

1. TRADE-MARKS AND TRADE NAMES, § 24*—*when evidence insufficient to show unfair competition by use of name of "Blue Book."* On bill to enjoin defendant from using the name "Blue Book" as the title to a publication which defendant was advertising to put on the market, on the ground that a book published by the complainant by the titles "Chicago Blue Book" or "The Blue Book" had become

*See Illinois Notes Digest, Vols XI to XV, and Cumulative Quarterly, same topic and section number.

known as publication of complainant's for a number of years and that to permit defendant to publish his book under such title would induce the public to believe that it is complainant's publication, *held* that the case was an "unfair competition" case and not a "trade-mark" case, and that the evidence was insufficient to show that the "Chicago Blue Book" or "The Blue Book" had been so exclusively identified with complainant's publication as to indicate complainant's publication alone, or that defendant was guilty of attempting to pass off his publication as that of the complainant.

2.   Contempt, § 70*—*when order imposing fine for benefit of complainant erroneous.* Upon a finding that defendant was guilty of contempt for violation of an injunction, an order imposing a fine upon the defendant for the benefit of complainant *held* erroneous.

Appeal from the Superior Court of Cook county; the Hon. John M. O'Connor, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1914. Reversed. Opinion filed July 28, 1914.

**Statement by the Court.**  This is an appeal by the defendant, Clark J. Herringshaw, from an interlocutory order or decree denying his motion to vacate and dissolve a preliminary injunction and adjudging him to be in contempt for violating said injunction and fining him $200.

On December 19, 1912, the complainant, Chicago Directory Company, an Illinois corporation, having its office and principal place of business in the city of Chicago, filed its sworn bill of complaint in the Superior Court of Cook county against said defendant. The bill alleges, in substance, that complainant's business was that of compiling, publishing and selling directories; that for many years, in addition to publishing the City Directory of Chicago, it had been publishing a book consisting of selected names from Chicago and suburban towns, known as "Chicago Blue Book"; that about the year 1890 complainant adopted said title for said book to designate it as being complainant's publication and has since continuously used said title, and that the book has acquired a ready sale and wide circulation, and has become known to the trade and the

*See Illinois Notes Digest, Vols XI to XV, and Cumulative Quarterly, same topic and section number.

public generally by the titles "Chicago Blue Book" or
"The Blue Book," as the publication of complainant
and of no other person or corporation; that since 1890
the book has been published each year and the volume
for the year ending 1912 is the twenty-third volume
of the series; that all of the volumes have borne con-
spicuously upon the outside cover thereof, and upon
the title page, the words "Chicago Blue Book," and
have been referred to by complainant in its advertise-
ments and announcements either by that title or "The
Blue Book"; that said words have acquired and now
possess a distinct secondary meaning, and, to dealers
in books and users of books, are understood to refer
exclusively to complainant's publication; that the de-
fendant is engaged in the business of publishing books
in the Lakeside building, Chicago, and has recently
distributed circulars wherein he has advertised that
he is about to put upon the market a book entitled
"City Blue Book of Chicago Biography," and defend-
ant is now engaged in soliciting subscriptions for said
book under that title; that the use of said words "Blue
Book," either in connection with the word "Chicago"
or alone, in defendant's said announcements has al-
ready caused confusion and induced the belief that de-
fendant's book was to be published by complainant
and was one of the series of complainant's "Chicago
Blue Book"; that if defendant is permitted to con-
tinue his said advertising and solicitation much dam-
age will ensue to complainant, and if defendant is
permitted to publish his said book the same will be
purchased by the public in the belief that it is complain-
ant's publication, and complainant and the reputation
of its publication will be greatly injured, and the public
will be deceived and misled; that the proposed use of
the said title of defendant's book is for the purpose
of enabling defendant to profit by the reputation of
complainant and of its said publication, and that de-
fendant's conduct is fraudulent in intent and result;

that complainant has duly warned defendant of its rights in the premises and requested him to refrain from the use of the words "Blue Book" or "Chicago Blue Book" in advertisements or otherwise as a title of any publication not complainant's, but defendant has entirely disregarded said warning and threatens to continue his practices as aforesaid, either in the exact form herein complained of or with variations, which are colorable only and which will not prevent the public being deceived or injury to complainant. The bill prayed that defendant and his agents, servants, etc., might be at first, during the pendency of this suit, temporarily enjoined, and afterwards permanently enjoined, etc., and that defendant might be required to account to complainant for all gains and profits, etc.

The motion of complainant for a preliminary injunction was referred to a master in chancery to hear the same and report his conclusions thereon. Subsequently the defendant filed an answer to the bill, duly sworn to, in which he denied that complainant was entitled to an exclusive use of the words "Blue Book," either alone or in connection with any other words, or to the relief prayed or any part thereof. On the hearing of the motion before the master no testimony was taken, but both parties introduced several affidavits and exhibits. On February 19, 1913, the master filed a lengthy report in which he reviewed the affidavits and exhibits, referred to many decisions of the courts, and concluded that complainant's motion should be granted, and recommended the issuance of an injunction against defendant, his agents, servants, etc., as prayed on complainant's bill. On the following day, February 20th, the court approved the master's report, overruled exceptions thereto, and ordered that upon complainant furnishing a bond of $5,000 an injunction issue as follows:

"That the said defendant, Clark J. Herringshaw, his agents, servants, employes, attorneys, workmen

and assigns be, and the same hereby each and all are, during the pendency of this suit and until the further order of the court, enjoined and restrained from using or employing in connection with the advertisement, publication, offering for sale or sale of any publication, not being the genuine publication of complainant, the words, 'Chicago Blue Book' or 'Blue Book of Chicago Biography,' or any like word or names, whether accompanied by other words or not; and from using or employing in connection with the advertisement, publication, offering for sale or sale of any publication, not being the genuine publication of complainant, the words 'Blue Book,' without clearly distinguishing the same from the publication of complainant so as unmistakably to indicate that the same is the publication of the defendant and not the publication of complainant; and further from using any name or names, device, artifice or contrivance which may be calculated to induce the belief that any publication not complainant's is in fact complainant's.''

On July 9, 1913, complainant filed a sworn petition and made a motion to commit the defendant for contempt for a violation of said injunction. The petition alleged, *inter alia,* that defendant's advertisements and announcements, which formed the basis of the charge of unfair competition in complainant's said bill of complaint and which were enjoined as aforesaid, contained as the title of defendant's proposed publication ''Herringshaw's City Blue Book of Chicago Biography''; that on or about June 1, 1913, the defendant caused to be sent to J. Platt Underwood and many other persons a certain circular, as a part of an advertising campaign conducted by defendant in connection with the distribution and sale of defendant's said publication, described by him as ''Herringshaw's City Blue Book of Biography, Chicago Men of 1914''; that such changes in the name of said publication are colorable only and that the distribution of said circulars is calculated to deceive the public and injure complainant and is in deliberate violation of said injunction.

Defendant was ruled to answer this petition by July 18th, which he did, and said petition and answer were referred to the same master in chancery to take evidence and report his conclusions. Defendant in his sworn answer disavowed any intention of violating said injunction and denied that he had been guilty of any violation thereof. The master found, and so reported to the court on July 29, 1913, that the advertising and offering for sale of defendant's publication under the title of "Herringshaw's City Blue Book of Biography, Chicago Men of 1914," as disclosed by said circulars was calculated to deceive the public and was a deliberate violation of said injunction, and recommended that the defendant be attached for contempt of court. Subsequently, on March 11, 1914, the defendant having previously moved for a dissolution of the injunction order of February 20, 1913, the court, after hearing arguments, ordered (1) that defendant's "said motion to dissolve and vacate said preliminary injunction be denied"; and (2) that the master's report on complainant's said petition be approved, that the defendant be adjudged to have committed the contempt as alleged and as found by the master, and that the said defendant "pay into court *for the benefit of the complainant,* within ten days   *   *   *   a fine in the sum of $200, and that complainant recover of and from the defendant its costs." etc. The defendant prayed an appeal "from this entire order," which appeal was allowed upon filing a bond in the sum of $250, and was subsequently perfected.

On the hearing before the master on the motion for a preliminary injunction, complainant submitted its sworn bill of complaint and various affidavits and exhibits. In the affidavit of Reuben H. Donnelley, vice president of complainant, it is stated in substance that complainant has published the "Chicago Blue Book" yearly since 1890; that that title has always appeared upon the outside of the book and upon the title page;

that in complainant's advertising and printed matter the words "Blue Book" have been frequently used as well as the full name "Chicago Blue Book"; that the book has a circulation of about 1,800 copies annually and is known to and used by many people; that affiant had some time previously received one of defendant's circulars advertising "Herringshaw's Chicago Blue Book of Biography," whereupon complainant at once communicated with defendant requesting him to discontinue the use of the names "Chicago Blue Book" or "Blue Book" in connection with his publication; that this correspondence resulted in the defendant substituting the word "City" for "Chicago" in the title of his publication, but still containing the word "Chicago" in a subtitle; that in affiant's opinion this was not sufficient to prevent confusion; and complainant again wrote defendant that said change was not satisfactory and requested further changes, but defendant did not reply. Attached to said affidavit as exhibits were circulars of complainant and defendant advertising their respective publications, and also certain letters, received by complainant during October and December, 1912, from certain individuals, advising complainant that they had received copies of defendant's circulars and making certain inquiries as to same. The affidavits of Martin B. Brennan, an employe in the book department of Carson, Pirie, Scott & Co., of H. A. Gould, an employe of A. C. McClurg & Co., booksellers, and of G. W. Ford, of the firm of Dunwell & Ford, dealers in stationery and books, were also presented by complainant. They were to the effect that the respective affiants had long been familiar with complainant's publication, known as "Chicago Blue Book" or "Blue Book," and that in their judgment and belief said names or titles indicated complainant's publication. In the affidavit of J. P. Underwood it is stated that in December, 1912, he received one of defendant's circulars; that at first he thought the cir-

cular was a request from complainant for him to renew his subscription for complainant's publication for the current year; that he "got this impression" from the fact the words "City Blue Book" and the word "Chicago" appeared upon the blank; that the words "Blue Book" in connection with any Chicago publication immediately associated themselves in his mind with complainant's publication; that on looking at the blank more closely it occurred to him that some other concern was about to put out a rival publication, and thereupon he wrote a letter of inquiry to complainant. In the affidavit of Finley Barrell, of Chicago, it is stated that early in October, 1912, he received one of defendant's circulars; that he at first assumed it was a subscription blank for complainant's publication, but that on closer inspection he was doubtful about it and he inquired of complainant, etc. The affidavits of A. D. White, employed in the advertising department of Swift & Co., Chicago, and of J. Q. Williams, a publisher's representative in Chicago, are to the same effect.

On behalf of the defendant, several affidavits with accompanying exhibits were presented. In the affidavit of Thomas W. Herringshaw, the father of defendant, it is stated in substance that affiant has been engaged in the publishing business in Chicago for thirty years; that his office has been in the Lakeside building, corner of Clark and Adams streets, Chicago, for more than ten years; that he has studied the history and meaning of the term "Blue Book"; that said term originated in England more than three hundred years ago, and has since that time been applied to various published reports, compilations and directories used by various departments of trade; that since 1681 the term has been applied by the British Government to reports and documents put forth by various branches of said Government, and has since come to be descriptive of reports put forth by any government; that this meaning

of the term has become so well established that reference to it is found in practically every encyclopedia and dictionary published; that the definitions contained in many dictionaries show that the term has come to mean also "a high class compilation of information"; that more than 1000 annual publications are issued in the United States with the title "Blue Book," either alone or in connection with another word or words, and that many of said publications are issued in the city of Chicago. Accompanying said affidavit as exhibits there were many "Blue-Books," published in Chicago and elsewhere, such as "Blue-Book of Chicago Commerce," "Automobile Blue-Book," "Illinois Medical Blue-Book," "Chicago Financial Blue-Book," etc., etc. In the affidavit of Frank M. Morris, a bookseller in Chicago for twenty-five years, it is stated that the term "Blue-Book" is used generally among publishers all over the United States "as a title to indicate a high class of names and addresses of persons in the particular trade or profession covered by such book." In the affidavit of Clark J. Herringshaw, the defendant, it is stated in substance that he adopted the general form and plan for his "Blue-Book" before he had ever seen or had his attention called to the "Chicago Blue Book" published by complainant; that he originally entitled his book "Herringshaw's Chicago Blue Book of Biography," and sent out requests for information to be used therein to various persons, said requests being upon printed blanks; that upon examination of complainant's publication it is disclosed that the same is merely a directory giving the names and addresses of members of clubs and of society people, largely ladies, of Chicago and suburbs, with certain information as to clubs, churches, societies, theatres, etc.; that upon examination of affiant's publication it is disclosed that the same is a collection of biographies of men prominent in the commercial and professional life of Chicago; that any

confusion caused by the similarity of titles is to his detriment, and that when he had his attention called to the similarity between the titles of the two publications he promptly changed the title of his publication to "Herringshaw's City Blue Book," with a subtitle consisting of the words "of Chicago Biography" to indicate the field of said publication, and on October 11, 1912, so informed complainant by letter; that after changing the title of his publication as aforesaid he issued new blank requests for information, containing the heading "Herringshaw's City Blue Book," with the words under it in small letters "of Chicago Biography"; that affiant's father, Thomas W. Herringshaw, has been engaged for many years in publishing various directories and "Blue-Books," including "Herringshaw's American Blue-Book of Biography"; that affiant, in framing up a form of circular for use in connection with his book copied the form of blank or circular used by his father; that affiant never saw the blank or circular used by complainant until after the commencement of this suit, and that complainant's blank or circular requests different information from that requested in affiant's blank and that the two blanks are easily distinguishable one from the other; that since affiant sent out his first lot of blanks, or requests for information, he has received about 5,000 letters from Chicago business and professional men; and that affiant has never received any complaint from any subscriber to his book that the latter subscribed under any misapprehension or under the impression that he was subscribing for complainant's publication.

SAMUEL SHAW PARKS, for appellant.

FRANK F. REED, EDWARD S. ROGERS and CHARLES A. WILLIAMS, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

This is an "unfair competition" case. It is not a "trade-mark" case. "Unfair competition consists in passing off or attempting to pass off upon the public, the goods or business of one person as and for the goods or business of another. * * * The basic principle is that no one has a right to dress up his goods or otherwise represent them in such a manner as to deceive an intending purchaser and induce him to believe he is buying the goods of another. No monopoly is created or fostered by protection against unfair competition, but the court should be careful not to interfere with free and fair competition, and should confine itself to preventing fraud and imposition from some real resemblance in name or dress of goods. Nothing less than conduct tending to pass off one man's goods or business as that of another will constitute unfair competition." (38 Cyc. 756.) In a well-known English case, *Burgess v. Burgess,* 3 De G., M. & G. 896, 904, Lord Justice Turner said: "No man can have any right to represent his goods as the goods of another person, but in applications of this kind it must be made out that the defendant is selling his own goods as the goods of another." "Descriptive terms and generic names are *publici juris* and not capable of exclusive appropriation by anyone, but may be used by all the world in an *honestly descriptive* and *non-deceptive* manner." (38 Cyc. 800.) "Geographical terms may be used by all persons for the purpose of truthfully stating the origin of materials used, or the location of a business, subject, however, to the general rules governing unfair competition." (38 Cyc. 802.) "Publications are property and entitled to protection against unfair competition like any other property." (38 Cyc. 831.) "Circulars, advertisements, or other announcements calculated to deceive the public and pass off defendant's goods or business as the goods or business of plaintiff constitute unfair competition and will be enjoined." (38 Cyc. 846.) Whether or not a

defendant has been guilty of unfair competition is always a question of fact. Each case must depend upon its particular circumstances, and the facts of one case are little or no guide to the determination of another. (38 Cyc. 779; *Reddaway v. Banham,* 13 R. P. C. 218, 233; 65 L. J. Q. B. 381, 391.)

The interlocutory order of injunction issued by the Superior Court, which is in the exact language as recommended by the master, is a broad one. It enjoins the defendant, Clark J. Herringshaw, his agents, servants, etc., until the further order of the court, (1) "from using or employing in connection with the advertisement, publication, offering for sale or sale of any publication, not being the genuine publication of complainant, the words 'Chicago Blue Book,' or 'Blue Book of Chicago Biography,' or any like words or names, whether accompanied by other words or not"; and (2) "from using or employing in connection with the advertisement, publication, offering for sale or sale of any publication, not being the genuine publication of complainant, the words 'Blue Book,' without clearly distinguishing the same from the publication of complainant so as unmistakably to indicate that the same is the publication of the defendant and not the publication of the complainant"; and (3) "from using any name or names, device, artifice or contrivance which may be calculated to induce the belief that any publication not complainant's is in fact complainant's."

There is attached to the transcript of the record before us a copy of complainant's book, entitled on the back of the cover "Chicago Blue Book, 1912," and also a copy of defendant's book, entitled on the back of the cover "Herringshaw's City Blue-Book of Biography. Chicago Men of 1913." Upon examination we find the books to be dissimilar in appearance, size and contents. There is also contained in the transcript of the record a sample copy of the circular, or subscription

Chicago Directory Co. v. Herringshaw, 187 Ill. App. 489.

blank, used by the complainant at and prior to the time of the commencement of the present suit, having at the top the words "The Blue Book" printed in large type; also a copy of the circular, or subscription blank, used by defendant at the time of the commencement of this suit, having at the top the words "Herringshaw's City Blue Book," printed in large type, and immediately underneath the words "of Chicago Biography," printed in smaller type; also a copy of the circular, or subscription blank, used by defendant at the time the proceedings against defendant for contempt were commenced, having at the top the words "Herringshaw's City Blue-Book of Biography," printed in large type, and immediately underneath the words "Chicago Men of 1914" printed in smaller type. The master, in his report recommending that an injunction issue, found substantially that an unwary person receiving the circular of defendant, first above mentioned, would be misled into thinking that the circular was an advertisement of complainant's publication, or a request for a subscription to complainant's book, and in his subsequent report on the petition of complainant to punish defendant for contempt he found to the same effect concerning defendant's circular last above mentioned. To these findings of fact we cannot agree. We do not think that even an unwary person would be likely to be so misled or deceived. There are many noticeable differences in the circulars, both in form and substance. Furthermore, the affidavits presented by complainant to sustain the point that defendant's circulars are so similar to the circular of complainant as to deceive the public contain mere expressions of opinion. They do not state facts from which such a conclusion may be reached. The affidavits of J. P. Underwood, Finley Barrell, A. D. White and J. Q. Williams, much relied upon by complainant, show on their face that these parties were not actually deceived, for the reason that each party,

upon receiving one of defendant's circulars immediately communicated with complainant either by letter or telephone. And it was stated to us on oral argument by counsel for complainant that there was no proof in the record to the effect that any person had actually contracted to purchase, or had purchased, defendant's book thinking that he was purchasing complainant's book.

It was alleged in complainant's bill that the words, contained in the title and advertisements of complainant's publication, "Chicago Blue Book" and "The Blue Book," had acquired and possessed a distinct secondary meaning, and to dealers in books and users of books were understood to refer exclusively to complainant's publication. In speaking of this doctrine of secondary meaning it is said (38 Cyc. 769) : "Words or names which have a primary meaning of their own, * * * and which are not capable of exclusive appropriation as a trade-mark, may nevertheless by long use in connection with the goods or business of a particular trader come to be understood by the public as designating the goods or business of that particular trader. Such words have both a primary and secondary meaning. In their primary descriptive sense, they are *publici juris,* and all the world may use them, but they must be used in such a way as not to *falsely* convey the secondary meaning, for this would constitute unfair competition. * * * In all this class of cases where the word, name, or other mark or device is primarily *publici juris,* the right to relief depends upon the proof. If plaintiff proves that the name or word has been so *exclusively* identified with his goods or business as to have acquired a secondary meaning, so as to indicate his goods or business *and his alone,* he is entitled to relief against another's *deceptive* use of such terms. If he fails in such proof, he is not entitled to relief."

In view of the affidavit of Thomas W. Herringshaw, and exhibits thereto attached, as to the number of

"Blue Books" published in Chicago and elsewhere, and in view of all other facts and circumstances as disclosed by the other affidavits and exhibits before us, we do not think that it was shown that the words "Chicago Blue Book" or "The Blue Book" had been so exclusively identified with complainant's publication as to indicate its publication alone, or that it was shown that the defendant was guilty of attempting to pass off upon the public his publication as and for complainant's publication. We are therefore of the opinion that the Superior Court erred in denying defendant's motion to dissolve the preliminary injunction.

In the order of March 11, 1914, appealed from, the court, in addition to denying defendant's motion to dissolve said injunction, adjudged that defendant was guilty of contempt for violating the injunction and that defendant "pay into court for the benefit of the complainant, within 10 days * * * a fine in the sum of $200." The court erred in imposing a fine upon defendant *for the benefit of complainant. Barnes & Co. v. Typographical Union,* 232 Ill. 402, 411; *Rothschild & Co. v. Steger Piano Co.,* 256 Ill. 196, 205.

The interlocutory order of March 11, 1914, is reversed.

*Reversed.*